**Lura Corrine CARREL, Respondent,**

v.

**Ronald Ray CARREL, Appellant.**

**WD 42300.**

Missouri Court of Appeals, Western District.

May 15, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 3, 1990.

Robert B. Paden, Maysville, for appellant.

Suzanne B. Bradley, St. Joseph, for respondent.

Before MANFORD, P.J., and KENNEDY and ULRICH, JJ.

KENNEDY, Judge.

Husband Ronald Ray Carrel appeals from a judgment finding him guilty of contempt of court for his alleged violation of the terms of a dissolution decree.

He claims, first, the evidence did not support the judgment finding him in contempt. On this point we reject his contention, holding that the evidence was sufficient to sustain the finding of contempt.

Lura Corrine Carrel on December 8, 1988, got a decree dissolving her marriage to Ronald Ray Carrel. Ronald had filed an answer and was therefore not in default, but he did not show up for the trial. The decree gave to each spouse as a part of the marital property a $10,000 certificate of deposit with the First Security Bank of Union Star. Both of these certificates of deposit were being held by the bank as security for the repayment of a $20,000 note to the bank by Carrel Brothers, a partnership in which Ronald and his brother, Gary Carrel, were co-equal partners, and in which Corrine had no interest. The decree contained the following provisions:

It is further ordered that [Ronald] shall hold [Corrine] harmless from any and all debts of the Carrel Brothers Farming Business and Carrel Brothers Tire & Battery Business, which include ... loan with First Security Bank of Union Star, Missouri.

After setting over to Corrine as a part of the marital property the $10,000 certificate of deposit, the decree proceeded:

[Ronald] shall have ninety (90) days from the date of this decree to release from loan security the certificate of deposit and transfer same to [Corrine].....

Ronald did not secure the release of the $10,000 certificate of deposit which had been set over to Corrine by the decree. The $20,000 Carrel Brothers note which was secured by the certificate of deposit was not paid when due. On April 9, 1989, the bank applied the two certificates of deposit, Corrine's and Ronald's, to the payment of the note.

Ronald upon Corrine's motion and after an evidentiary hearing was adjudged to be in contempt of court. Ronald claimed in the trial court and continues to maintain here that his failure to free Corrine's certificate of deposit from the pledge to the bank was not contumacious but that he was unable to comply with the court's decree. This was a contention which might have been accorded more weight in the trial of the dissolution case, but Ronald let that opportunity go by the boards.

■ If indeed Ronald was unable to liberate the certificate of deposit from the pledge so it could be delivered to Corrine, his failure to do so was not contumacious, *Teefey v. Teefey*, 533 S.W.2d 563, 566–67 (Mo. banc 1976); *State ex rel. Stanhope v. Pratt*, 533 S.W.2d 567, 575 (Mo. banc 1976); *State ex rel. Foster v. McKenzie*, 683 S.W.2d 270, 271 (Mo.App.1984); *In re Marriage of Vanet*, 544 S.W.2d 236, 244–46 (Mo.App.1976), and the court erred in finding him in contempt. It was Ronald's burden to show the court he was *unable* to perform the order of the court, not Corrine's burden to show he was *able* to do so. *Owsley v. Owsley*, 693 S.W.2d 897, 898 (Mo.App.1985); *Wisdom v. Wisdom*, 689 S.W.2d 82, 85 (Mo.App.1985); *Huber v. Huber*, 649 S.W.2d 955, 958 (Mo.App.1983); *In re Marriage of Vanet*, 544 S.W.2d at 246. To excuse Ronald from the penalties of contempt, it is not enough for him to show merely that it would have been *difficult* for him to perform the court's order, or *inconvenient.*

■ The farming business and the tire and battery business were operated as separate businesses by Ronald and his brother, Gary, as co-equal partners. Brother Gary had full-time employment off the farm and it was apparent from his testimony that he was familiar with the financial partnership business affairs only in a general way and he was passive in their operation. Ronald worked essentially full time at the partnership business, and the management of the finances was left largely to him. There was evidence of some consultation between the brothers, but it

could be believed that the consultation was slight, infrequent and somewhat pro forma.

The two certificates of deposit had been pledged to the bank since 1986, perhaps intermittently, to secure successive notes of $20,000. It was the practice of the partnership to pay the note each fall and winter from the proceeds of crop sales, then to borrow the same amount for financing the next year's crops. In 1989, though, after the December 8, 1988, dissolution decree, the partnership, departing from its usual practice, defaulted in the payment of the $20,000 note and allowed the proceeds of the two certificates of deposit to be applied to its payment.

The chief source of Carrel Brothers' partnership income was the sale of grain. It is rather difficult, as the trial court noted, to figure out from the evidence the amount received by the partnership from 1988 crops, which were sold in the fall and winter of 1988–89. However, there was paid by the partnership during this period debts and interest totalling $43,472.48 to 15 different creditors. There is no evidence that Ronald made any effort to defer the payment of these debts, or any part of them, or to renegotiate them. He simply unilaterally—unilaterally, that is, as to Corrine—elected to prefer the other creditors. The urgency of the payment of any of the debts is not clear from the evidence. The outcome was in accordance with his unconcealed and earlier announced intention to default in the payment of the $20,000 note and to allow the application of the proceeds of the certificates of deposit to its payment.

Ronald immediately before the dissolution decree withdrew $4,001 (not included in the above $43,472.48 total of payments) from a marital bank account, which was transferred to the tire and battery account. He testified that this money was used to pay an account owing by his father to the tire and battery business for merchandise purchased by his father from the tire and battery business. The testimony is not clear, but a part of this $4,001 withdrawal may also have been paid directly to Ronald's parents, with whom Ronald was living.

From all the partnership funds which came into Ronald's hands or under his control, and those which he withdrew from the marital bank account, none was used either to pay or to reduce the $20,000 note which was secured by the certificates of deposit.

Taking the evidence and inferences which are favorable to the trial court's judgment, see Miller v. Miller, 748 S.W.2d 179, 180 (Mo.App.1988); Wynn v. Wynn, 738 S.W.2d 915, 918 (Mo.App.1987); Wood v. Wood, 709 S.W.2d 143, 147 (Mo.App. 1986); remembering that the burden of proof is upon Ronald to prove his inability to comply with the court's decree, see Owsley, 693 S.W.2d at 898; Wisdom, 689 S.W.2d at 85; Huber, 649 S.W.2d at 958; In re Marriage of Vanet, 544 S.W.2d at 246, bearing in mind that credibility of witnesses is for the trial court, and the court is not required to believe even uncontradicted self-serving testimony, see Herbert v. Harl, 757 S.W.2d 585, 587 (Mo. banc 1988); Centerre Bank of Branson v. Campbell, 744 S.W.2d 490, 498 (Mo.App. 1988); Bess v. Bess, 720 S.W.2d 757, 758 (Mo.App.1986); Trapani v. Trapani, 684 S.W.2d 500, 503 (Mo.App.1984), and applying the standard of review of Rule 73.01 and Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976), we find that the judgment of the trial court that Ronald is guilty of contempt is supported by the evidence and must be affirmed.

For his second point, Ronald argues that the trial court erred in reopening the evidence to permit Corrine to present additional evidence. Ronald states that Corrine should have been required to show good cause for reopening the evidence.

Prior to the June 23, 1989, judgment of contempt, there was an earlier order entered on April 3, 1989, which found that Ronald was unable to pay off the loan so as to free the certificate of deposit as collateral on the loan. On April 12, 1989, Corrine filed a motion to reopen the evidence because she stated that she was surprised by Ronald's testimony at the April 3, 1989, hearing and that she had since obtained

certain documents that were not attainable on April 3, 1989. The trial court allowed Corrine to reopen the evidence and additional hearings were held on April 18, 1989, and on May 25, 1989, resulting in the June 23, 1989, judgment of contempt.

Under Rule 75.01, a trial court retains control over its judgment for thirty days after the entry of the judgment and the court may reopen its judgment for good cause within that time. The decision to allow a party to reopen the evidence is within the sound discretion of the trial court and its decision will be reversed only upon a clear showing of abuse of its discretion. *Crossroads Economic Development Corp. of St. Charles County, Inc. v. West,* 704 S.W.2d 302, 303 (Mo.App.1986); *Matter of Estate of Viviano,* 624 S.W.2d 130, 133 (Mo.App.1981); *see also, Pride v. Lamberg,* 366 S.W.2d 441, 445 (Mo.1963).

In this case, Corrine filed her motion to reopen the evidence within nine days of the April 3, 1989, hearing. No unfair advantage resulted in reopening the evidence. The decision to reopen the evidence was within the sound discretion of the trial court and the court did not abuse its discretion.

Ronald's third point is that the court erred in requiring him to assign to Corrine his earnings of $250 per month as a member of the National Guard.[1]

As punishment for the contempt, the trial court assessed a fine of $10,000 with 9% annual interest after March 8, 1989, to be entered as a judgment in favor of Corrine. At least half the fine and accrued interest was to be paid on or before January 30, 1990, and the remainder not later than January 30, 1991. Ronald does not complain of the assessment of the fine, but of the following provision in the court's judgment:

It is further ordered that respondent personally appear before this court on July 7, 1989, at 9:00 a.m. to present written verification that he has assigned the entirety of all future and accrued income from the National Guard to the petitioner until the aforementioned fine and interest is paid in full as a means of purging himself from contempt herein, and in default thereof, to be prepared to be committed to the Buchanan County jail until the contempt is purged as directed by this court....

Ronald maintains that the court's requirement that he assign to Corrine 100% of his National Guard earnings was in violation of 15 U.S.C.A. § 1673 (1982), which limits the portion of a debtor's earnings which may be garnished.

The first question is whether the court's order to Ronald to assign his National Guard earnings constitutes a "garnishment" within the meaning of 15 U.S.C.A. § 1673. It is not, as the parties agree, a classic garnishment. It does, however, fall within the definition of the term "garnishment" as defined by 15 U.S.C.A. § 1672(c) (1982), which says: "The term 'garnishment' means any legal or equitable procedure through which the earnings of any individual are required to be withheld for payment of any debt." The court undertook to order Ronald, on pain of incarceration, to execute an assignment which would cause the National Guard to withhold Ronald's earnings and pay them to Corrine. An involuntary wage assignment is a "garnishment" within the meaning of 15 U.S.C.A. § 1672(c) (1982), *see In re Marriage of Allen,* 681 S.W.2d 535, 540 (Mo. App.1984); *Marshall v. District Court for the 41st-b Judicial District of Michigan, Mt. Clemens Division,* 444 F.Supp. 1110, 1115–16 (E.D.Mich.1978). We hold therefore that the assignment enjoined upon Ronald was within the protection of 15 U.S.C.A. §§ 1672 and 1673.

Having determined that the court's order to Ronald to assign his earnings was a "garnishment", within the meaning of 15 U.S.C.A. §§ 1672 and 1673, we must determine whether it was an "order for the

---

**1.** Ronald testified there were no profits from the partnership and he had taken no funds from the partnership. When he was asked, "How did you get by? How did you live?", he answered: "Well, I'm in the National Guard, and I went to every extra activity I could possibly get paid for, and I get about $3,000 from that total."

support of any person" within the meaning of 15 U.S.C.A. § 1673(b) (1982). If it was an "order for the support of any person", then 60% or 65% of Ronald's earnings were subject to garnishment, 15 U.S.C.A. § 1673(b)(2)(B) (1982).[2] If on the other hand the court's order was not an "order for the support of any person", then none of Ronald's National Guard pay, under the limitation of § 1673(a), would be subject to garnishment. That section allows the garnishment of the lesser of "(1) 25 per centum of [debtor's] disposable earnings for that week, or (2) the amount by which his disposable earnings for that week exceed thirty times the Federal minimum hourly wage prescribed by section 206(A)(1) of Title 29 in effect at the time the earnings are payable." Ronald's National Guard earnings of $66.66 per week ($250 per month divided by 4⅛ weeks) do not exceed the federal·minimum wage of $3.80 per hour multiplied by 30. (*See* formula at section 525.030.2, RSMo 1986.)

The policy in Missouri, contrary to the policy prevailing in some states,[3] is thus expressed in *V— v. S—*, 579 S.W.2d 149, 151 (Mo.App.1979): "Any exception to the maximum garnishment restrictions must be narrowly construed." In that case, the court held that a judgment in favor of a mother against a father of an illegitimate child for necessaries furnished by the mother was not an "order for the support of any person", hence that the garnishment restrictions of 15 U.S.C.A. § 1673(a) and of section 525.030.2, RSMo 1986, applied. In *Dyche v. Dyche*, 570 S.W.2d 293 (Mo. banc 1978), the court held that attorney's fees granted to a wife in a dissolution proceeding were not "an order of any court for the support of any person". Said the court:

The words 'any order of any court for the support of any person' as contained in § 525.030–2 are not ambiguous. When given their ordinary meaning they refer to child support or maintenance, as those terms are used in the Dissolution of Marriage Act, or any other order to provide for subsistence or maintenance, but they do not include any order entered pursuant to § 452.355 that one party in a proceeding under the Dissolution of Marriage Act pay to the other party an amount for that party's attorney fees.

*Dyche*, 570 S.W.2d at 297.

We hold, therefore, that the court's order requiring Ronald to assign his National Guard earnings to Corrine, while a garnishment within the meaning of 15 U.S.C.A. §§ 1672 and 1673, is not "an order for the support of any person". For that reason the garnishment restrictions of § 1673(a) are applicable and they exempt Ronald's National Guard earnings from garnishment.

That part of the court's decree requiring Ronald to assign his National Guard earnings is therefore stricken from the judgment. With that modification, the judgment is affirmed.

All concur.

---

**2.** The Missouri statutes exempt no part of one's earnings from garnishment for maintenance or child support. 15 U.S.C.A. § 1673(b)(2), however, does limit the amount of one's wages subject to garnishment for support. To the extent federal law establishes larger exemptions than state law, state law is preempted. *Hodgson v. Cleveland Municipal Court*, 326 F.Supp. 419, 431–32 (N.D.Ohio 1971).

**3.** Some courts give a more inclusive interpretation to support orders, and give to exemptions from garnishment of earnings a narrower scope. In *Kahn v. Trustees of Columbia University*, 492 N.Y.S.2d 33, 37 (N.Y.App.Div.1985), an award to the wife by a matrimonial court for the husband's conversion of her share of joint bank accounts was "an order for the support of a person" within the meaning of 15 U.S.C.A. § 1673(b)(2). In *Cashin v. Cashin*, 186 N.J.Super. 183, 451 A.2d 1331, 1332–333 (Ct.Ch.Div. 1982), counsel fees were considered "support" within the meaning of 15 U.S.C.A. § 1673(b)(2).